PRYOR *v.* THE STATE.

No. 6596.   February 23, 1929.

*Maddox & Futral, McGehee & McGehee,* and *A. W. & John G. Cozart,* for plaintiff in error.

*George M. Napier, attorney-general, E. M. Owen, solicitor-general,*

*T. R. Gress, assistant attorney-general, Cleveland & Goodrich, W. H. Connor,* and *C. A. Byars,* contra.

BECK, P. J. Lee Pryor was tried on an indictment charging him with the offense of murder. The person alleged to have been murdered was Oscar Atkinson. The jury returned a verdict of guilty, without a recommendation. A motion for a new trial was made by the accused, and to the judgment overruling the same he excepted. The original motion contains the usual general grounds, and the amendment contains numerous special grounds.

■ In the first special ground of the motion for a new trial error is assigned upon the following charge of the court to the jury: "It is for you to say whether deceased entered defendant's home to arrest him, or for some other purpose, and whether deceased was invited to go there and by whom, and whether his presence there was lawful. It is a question of fact for you to say whether or not any offense had been committed in deceased's presence or within his immediate knowledge, and whether or not the defendant was the offender and was endeavoring to escape, or there was or not likely to be a failure of justice for the want of an officer to issue a warrant. And if you say the offense, if any, was committed by the defendant in the presence or within the immediate knowledge of deceased, or that the offender was endeavoring to escape, or there was likely to be a failure of justice for want of an officer to issue a warrant, and under such circumstances the deceased attempted an arrest, if he did, it would be a legal arrest."

Upon careful examination we are of the opinion that one part of this charge, as to which there is a special assignment of error, was not authorized by the evidence in the case, and that therefore the contention of the plaintiff in error should be sustained. In this charge the court stated to the jury that "It is a question of fact for you to say whether or not any offense had been committed in deceased's presence." This was one of the vital questions in this case, as presented in the motion for a new trial, and in the motion it is insisted that this charge was error, "because there was no evidence that any offense had been committed in the presence of Oscar Atkinson, the deceased." An examination of the evidence reveals that this exception is well taken. The evidence shows clearly that no offense had been committed in the presence of the slain officer. There was evidence introduced by the State showing

that on the night of the homicide the chief of police of the City of Griffin received a telephone message which came from the residence of Bill Sikes. Sikes' house was four or five blocks from the police station referred to, and the home of the accused was very near Sikes' home, nearly adjoining it. When that message came the chief of police directed Atkinson to procure a taxi and "hurry" to the house of Lee Pryor. Atkinson and Harper, another officer, obtained a taxi and immediately hurried towards the residence of the accused. They stopped in front of Sikes' house, next to Pryor's home. When the police officers went into Sikes' house, Mrs. Pryor, the wife of the accused, had a talk with them. She said that Lee Pryor, her husband, "was all out of whack, and to go and quiet him or put him up." Mrs. Pryor and her daughter were in their night-clothes. The police officers then went immediately to Pryor's house. They pushed open a screen door, walked into the hall and pushed aside a curtain, and Lee Pryor fired a shotgun and inflicted a mortal wound upon Atkinson, from which he died a few hours later. Pryor stated to the jury that he had received, a short time before, a threatening letter, which he thought came from some member of the Ku Klux Klan, and that when he heard the officers he thought it was some one who had come in pursuance of threats made in that letter, and in consequence of this he fired, killing the officer. There was evidence by other witnesses that, a few minutes before Atkinson and the other officer came to the house of Sikes, a neighbor heard Pryor uttering menacing words, apparently addressed to his family, threatening to kill every one of them; and the jury could have inferred that it was in consequence of these threats by her husband that Mrs. Pryor and her daughter fled to the house of her next-door neighbor. The officers, when they were told by the wife of Pryor that the latter "was out of whack" and to quiet him or lock him up, and when they saw her condition, that she had come from her home in her night-clothes and barefooted on a winter's night, could infer that the husband had been guilty of great violence against his wife and the daughter. The daughter's testimony for the defense on the trial was very much tempered. She virtually testified that the father, the accused, had wanted to wake up the baby, his grandchild, to see it; that his wife had protested, and he insisted; that he was drunk; and that they left then and went over to their neighbor, Sikes. But it was she

who called the chief of police to send an officer to Lee Pryor's home; and she then said, speaking to the chief of police by telephone, "Come to Lee Pryor's; he is drunk and trying to kill his family." There was other evidence tending to show that Pryor virtually drove his wife and daughter from his house, using the most violent threats, saying, as they went, "I will kill every one of you."

But there is no evidence to show that the offense the commission of which caused the telephone call to the chief of police, or any part of it, was committed in Atkinson's presence. If he had heard the threats of Pryor against his family, or if the officers who went to arrest him or to quiet him had arrived in time to see him commit any part of the offense, or perhaps if they had seen any member of his family fleeing from his house in consequence of the threats, it might be said that the offense had been committed in the presence of the officers, and this would have authorized an arrest without a warrant. But no part of the offense was committed in the presence or in the hearing of the officers. In *Ramsey* v. *State,* 92 *Ga.* 53 (17 S. E. 613), it was said: "An officer may arrest without warrant for wife-beating, if he arrives at the scene during the progress of or immediately after the beating, he being attracted thereto by the noise of the disturbance or the outcry of the woman." And there are other cases which might be cited to the same effect. But in the present case the officers were not attracted by hearing the violent threats of Lee Pryor or the outcries of the members of his family, nor did they see the family going into the house of a neighbor. They learned of the offense by a telephone message, by being told of what had taken place; and we do not think that this was the equivalent of having the offense committed in their presence, actually or constructively. Consequently, the part of the charge to which we have specially referred was error,—error as to a material question in the case, and error that must have been hurtful to the accused, and therefore it was such error as requires the grant of a new trial.

■ Under all the facts and circumstances of the case, the court did not err in submitting to the jury the question as to whether the deceased, a police officer, entered the defendant's home to arrest him or for some other lawful purpose. The deceased saw the wife of the accused in the home of a neighbor adjoining the home of the accused. The wife in her night-clothes, barefooted, in complete

disarray as to her raiment, and urging the deceased to go to her husband and quiet him or lock him up, created such an urgent demand for the officer in the house of the defendant as to make his entrance there, for the purpose of quieting the drunken husband, who had threatened violence to his family, a lawful entry. The facts and circumstances were peculiar. If the State's evidence be true, the wife was driven from her home under dire threats and menaces, under circumstances that were calculated to put her in fear for her life and in fear for the life and safety of her young daughter. What should an officer have done under those circumstances? Should he have said to the woman, "Stay at the house, although you have no clothing with you, and stay here in your neighbor's house till your husband gets sober or has calmed down?" The husband had just threatened to kill every member of his family. He was within a few steps of them. He had a deadly weapon in his possession. He was in a rage, and his words were such as to indicate that he was in a deadly rage. If the officer went there to calm him, he was merely doing his duty.

■ The rulings in headnotes 3, 4, 5, 6, 7, and 8 require no elaboration.

■ Error is assigned upon the refusal of the court to give the following in charge to the jury: "The court charges you that it is the duty of arresting officers, under circumstances affording reason to believe that their object and official character are unknown to persons whom they seek to arrest, to so inform the latter. The officer must at the time be engaged in executing his duty, and the defendant must be notified thereof; and unless there be notification or knowledge to this effect, the killing of the officer would not be murder." It was not error to refuse this charge in its absolute form, because it assumed that Atkinson, the officer, was there solely for the purpose of making an arrest, and he may have entered for the purpose of attempting to persuade the accused to calm himself and to desist from further threatening or menacing his wife and family. Suppose that a neighbor living in the immediate proximity to the house of the accused had heard his threats to kill every member of his family, had seen them flee from the house, and therefore had reason to believe that the lives of the family were in jeopardy; that the man who had uttered the threats was crazed by liquor and insensate with anger against his wife and children. Could he not

have rushed into the house to stop the man, or in some way to appease and calm him? We think that a man, a mere friend, or an officer can go into a house under such conditions; and that if the owner of the house had been guilty of such insensate conduct and alarming behavior as the evidence shows that Pryor was on the occasion in question, any one who heard the threats could enter the house to prevent the man from carrying out criminal threats against his wife and her children, just as much so as if, having heard the cry of fire and seen a blaze in the house, he could rush in to extinguish it.

A witness for the State, Mrs. Ison, over objection of defendant's counsel, was permitted to testify as follows: "On December 31st of last year I lived at 418 West Broad Street, Griffin, Georgia. He [the defendant] lived on the opposite side of the street. I know Lee Pryor. I did not remain at home after supper that evening. I went to Mrs. Bunn's. I returned home about nine-thirty, somewhere around that. When I returned to my home my attention was directed to something across the street. I heard a little fuss, and I saw some one run out of the door. My attention was first attracted by the fuss. And then they came out of the door and went to a neighbor's house. There were two grown girls and Mr. Pryor's wife that came out of the house. I saw Pryor on that occasion, and he came out of the door and said: 'I will kill every one of you, G—d d—n you.' They went to Mr. Sikes' house. They entered his home. At that time I was on the porch. Soon after that I heard shooting. I heard Pryor say, 'I will kill every G—d d—n one of you, G—d d—n you.' Mrs. Pryor walked on toward Mr. Sikes' house. Mrs. Pryor had on her night-clothes and was barefooted when she ran out of the door. He was on the porch. I don't know that he had anything with him to kill anybody. I heard him say that he would kill them. Mr. Pryor was in his night-clothes." This evidence was objected to on the ground that it was irrelevant, that there was nothing to show that what was said and done by Pryor was communicated to any officer, and that it was injurious and prejudicial to movant. The evidence was material and admissible. It explained Mrs. Pryor's flight with her children from her home to the next-door neighbor's. It might illustrate the condition they were in when the officer saw and talked with them. If when Mrs. Pryor spoke to the officer, Atkinson, urging him to go to the house

and to take her husband in custody and quiet him, she was agitated, shaken in emotion, in manifest fear (and the jury might well have believed that she showed all these signs of fright and trepidation), then it became only more imperatively the duty of the officer to go immediately to Pryor's house at least to persuade him to come to his senses and be quiet. And to shoot an officer entering the house under those circumstances, after all that had transpired and after all of the violent conduct and direful threats that Pryor had made, was murder. As we have said before, in dealing with this evidence we have merely dealt with the theory of the State, which authorized the court to charge thereon, and which required the court to admit the evidence. The defendant made his statement and introduced evidence to show that he had fears for his life, caused by threats communicated in a letter to him. The theory of the defendant made by this statement was duly submitted to the jury by the court in his charge. The issue made by the evidence for the State, and by the statement of the prisoner and the testimony of his witnesses, was clearly outlined so that the jury might pass upon it, and no error is shown in any of the grounds of the motion for new trial, except as shown in the first division of the opinion.

*Judgment reversed. Hill and Hines, JJ., dissent. The other Justices concur.*

RUSSELL, C. J. I concur in the judgment of reversal and in the ruling announced in the first headnote; but I can not agree to the rulings in the second, third, fourth, fifth, sixth, seventh, and ninth headnotes or what is said in the corresponding divisions of the opinion. Under the uncontradicted evidence in this case, at the time that the person named telephoned to the chief of police the defendant's wife and daughter had left the house where the defendant was, and were safe from any further molestation and in the protection of the family of a neighbor in a neighboring home, the head of which, so far as appears from the record, was an able-bodied man. The evidence clearly shows that if the defendant had committed an offense against his wife and daughter, and if the arrest of the defendant was desired, there was ample opportunity to obtain a warrant, and that the defendant was making no attempt to escape. The right of personal liberty can not be infringed by the taking of one's body into personal custody otherwise than by a lawful warrant. No right of personal liberty is more precious than

the right of freedom from unlawful arrest. The law makes but three exceptions. One is where the crime is committed in the presence of the person seeking to make the arrest, and this exception makes no distinction between an officer and a private person. In such a case any one who sees the crime committed may arrest and hold the offender until other means of effecting his lawful custody are available. The second is where there is lack of an officer to issue a warrant; and the third is where the offender is seeking to escape. None of these appear in this case.

I can not agree to the second division of the opinion, because the facts of the case do not present any circumstances which would have authorized the policeman to enter the defendant's home without a warrant. The request of the wife, even. if partly proper, presented an alternative ultimate which was illegal. It naturally follows that had this evidence been excluded the court would not have given the instructions which are dealt with in the third headnote. The testimony dealt with in the fourth headnote was perhaps immaterial, but it was nevertheless prejudicial to the defendant, and in my opinion the ruling in the fourth headnote is incompatible with the ruling of the court in the first headnote. In view of what has already been said with regard to the right of the deceased officer to go to the home of the defendant with the option either to "quiet him or put him up," the evidence as to what the wife of the accused said, not in the presence of the defendant, but at a different place and without his hearing, was inadmissible, and its admission was not cured by the statement of the court that it was admitted "only to explain the conduct of Mr. Atkinson after that. It is not admitted to establish the fact of the drunkenness of the accused, and you will not consider it for that purpose." Furthermore, this evidence was objectionable on the ground that it was hearsay, and upon the ground that the wife is incompetent as a witness against her husband. In my opinion, counsel for the State, although he may be authorized to refer to a defendant on trial for murder as one guilty of murder, and to call him a murderer, was not, under the evidence in this case, authorized to denominate the accused as an assassin. One may be a murderer under several phases of our law, and yet not with propriety be denominated by the foul term assassin. The court should have charged the jury, as timely requested, "that it is the duty of arresting officers, under

circumstances affording reason to believe that their object and official character are unknown to persons whom they seek to arrest, to so inform the latter. The officer must at the time be engaged in executing his duty, and the defendant must be so notified thereof; and unless there be notification or knowledge to this effect, the killing of the officer would not be murder." It was error to refuse this charge, because the request or instruction to the officer gave him the alternative of arresting, if he chose, in disregard of law, and there is no reason disclosed by the evidence why he should have entered the home of the accused for the purpose of persuading the accused to calm himself. It does not appear that the deceased was a neighbor, a relative, a friend, or was even personally acquainted with the defendant.

HILL and HINES, JJ. We dissent from the ruling of the majority embraced in the first headnote and the corresponding division of the opinion. We do not think that the trial judge erred in giving the instruction dealt with in this ruling. It is not necessary that an officer should actually see the offense committed before he can arrest without a warrant. If the circumstances are such as lead him reasonably to believe that an offense has been committed, the offense is, under the law, committed in his presence. *Ramsey* v. *State,* 92 *Ga.* 53 (supra) ; *Brooks* v. *State,* 114 *Ga.* 6 (39 S. E. 877). Under the evidence in this case the jury would have been authorized to find that the circumstances were such as to lead the officer reasonably to believe that an offense had been committed, and that the offense, under the law, had been committed in his presence. So we are constrained to dissent from the conclusion reached by the majority in this ruling.